Aaron R. Bleharski (SBN 240703)
ableharski@sidley.com
SIDLEY AUSTIN LLP
1801 Page Mill Road, Suite 110
Palo Alto, California 94304
Telephone:  (650) 565-7000
Facsimile:  (650) 565-7100

Attorney for Movant
SynQor, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE SUBPOENA  ISSUED TO CISCO **CV 10**  Case No.:  **80144 MISC.**
SYSTEMS, INC.

)
)
)    [E.D. Tex. Case No. 2:07-CV-497-TJW-CE,
)    *SynQor, Inc. v. Artesyn Tech., Inc. et al.*]
)
)    **SYNQOR, INC.'S NOTICE OF MOTION**
)    **AND MOTION TO COMPEL**
)    **COMPLIANCE WITH ITS SUBPOENA TO**
)    **CISCO SYSTEMS, INC. (PURSUANT TO**
)    **F.R.C.P. 45)**
)
)    Before:    TBD
)    Date:      TBD
)    Time:      TBD
)    Place:     TBD
)

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................1

II.   STATEMENT OF FACTS...................................................................2

    A.    The Patented Technology and the Litigation ................................2

    B.    The Subpoena to Cisco and Cisco's Response to Date ...................2

        1.    Requests Relating to Cisco's Use of Defendants' Products in IBA Systems .............................................................3

            a.    SynQor's Requests...............................................3

            b.    Cisco's Response .................................................3

                i. Cisco's Failure to Identify All of Its IBA products......3

                ii. Deficiencies Regarding IBA products Cisco Has Identified..............................................................4

        2.    Requests for Worldwide Sales Data for Cisco IBA Products ....5

        3.    Requests for Documents Showing Defendants Knowledge of the Use of Its Products by Cisco .........................................6

        4.    Requests Relating to Cisco's Decision to Use IBA and Consideration of Alternatives .............................................7

III.  ARGUMENT...................................................................................7

    A.    Legal Standards .........................................................................7

    B.    The Discovery Sought is Relevant, Not Unduly Burdensome, and Not Readily Obtainable From the Defendants or Third Parties .............................8

        1.    Requests Relating to Cisco's Use of Defendants' Products in IBA Systems.........................................................8

        2.    Requests for Worldwide Sales Data for Cisco IBA Products ..10

        3.    Requests for Documents Showing Defendants Knowledge of the Use of Its Products by Cisco..........................................11

        4.    Requests Relating to Cisco's Decision to Use IBA and Consideration of Alternatives .............................................11

III.  CONCLUSION ..............................................................................12

# TABLE OF AUTHORITIES

## CASES

*3Com Corp. v. D-Link Sys, Inc.*,
     2007 WL 949596 (N.D. Cal. Mar. 27, 2007)..............................................................6, 10

*Camden Iron and Metal, inc. v. Marubeni America Corp.*,
     138 F.R.D. 438 (D.N.J. 1991)..............................................................................10

*Compaq Computer Corp. v. Packard Bell Elec., Inc.*,
     163 F.R.D. 329 (N.D. Cal. 1995)..............................................................................8

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
     567 F.3d 1314 (Fed. Cir. 2009)..............................................................................7

*DSU Medical Corp. v. JMS Co., Ltd.*,
     471 F.3d 1293 (Fed. Cir. 2006)..............................................................................11

*Dynacore Holding Corp. v. U.S. Philips Corp.*,
     363 F.3d 1263 (Fed. Cir. 2004)..............................................................................1, 9

*Gonzales v. Google, Inc.*,
     234 F.R.D. 674 (N.D. Cal. 2006)..............................................................................7

*In re Legato Systems, Inc. Securities Litigation*,
     204 F.R.D. 167 (N.D. Cal. 2001)..............................................................................10

*In re Mettke*,
     570 F.3d 1356 (Fed. Cir. 2009)..............................................................................7, 11

*Manville Sales Corp. v. Paramount Systems, Inc.*,
     917 F.2d 544 (Fed. Cir. 1990)..............................................................................11

*Power-One, Inc. v. Artesyn Technologies, Inc.*,
     599 F.3d 1343 (Fed. Cir. 2010)..............................................................................7, 11

*Sedaghatpour v. California*,
     2007 WL 4259214 (N.D. Cal. Dec. 3, 2007)..............................................................8

*Truswal Systems Corp. v. Hydro-Air Engineering, Inc.*,
     813 F.2d 1207 (Fed. Cir. 1987)..............................................................................8

*Wiwa v. Royal Dutch Petroleum Co.*,
     392 F.3d 812 (5th Cir. 2004) ..............................................................................7

## RULES

Fed. R. Civ. P. 26..............................................................................7, 8

## NOTICE OF MOTION AND MOTION

TO CISCO SYSTEMS, INC. AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT at _____, or as soon thereafter as the motion can be heard, at 280 South 1st Street, San Jose, California, SynQor, Inc. ("SynQor") will and hereby does move this Court for an Order compelling compliance with its subpoena to Cisco Systems, Inc. ("Cisco").

This motion is based on this Notice of Motion, Motion, and Memorandum of Points and Authorities, the supporting Declaration of David T. DeZern ("DeZern Decl.") filed herewith, and such further matters as may be brought to the Court's attention prior to submission of this motion for decision.  The parties have met and conferred in accordance with Civil L.R. 37-1(a) but were not able to resolve their disputes.  (*See* DeZern Decl., at ¶21).

## RELIEF SOUGHT

SynQor respectfully requests that this Court order Cisco to comply with the subpoena SynQor served upon it by producing the documents requested and suitable Rule 30(b)(6) witness(es) for the topics related to these documents.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This is a patent infringement suit filed by Plaintiff SynQor, an innovator, designer and manufacturer in the field of power electronics against eleven of its competitors[1] (the "defendants") in the U.S. District Court for the Eastern District of Texas.  The patents–in–suit[2] relate to various aspects of a novel power electronics architecture called Intermediate Bus Architecture, or "IBA," pioneered by SynQor and subsequently adopted by the industry, including defendants.  Each of the named defendants contributorily infringes and induces infringement of the claims of four of the patents-in-suit by, among other things, selling to end-product manufacturers products (called "bus converters") that are covered by the patents-in-suit and specifically designed for use in the manner described in the claims, with the knowledge and intent that they be used in a manner that infringes the patents.  Cisco Systems, Inc. ("Cisco") is one of those end-product manufacturers.

In order to establish contributory and induced infringement by the defendants, SynQor must show that a direct infringement has taken place by end-product manufacturers, such as Cisco, who sell end-products that incorporate the defendants' bus converters.  *See Dynacore Holding Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement").  Approximately one year ago, on June 9, 2009, SynQor served a subpoena on Cisco requesting relevant documents, including (among other things) documents that would show all the products sold by Cisco using the patented IBA systems, schematics of those products, and the specific bus converters qualified by Cisco and used in those schematics.  Despite the fact that this information is highly relevant to the Texas action and clearly within Cisco's possession, custody, or control, more than a year later, Cisco production is still incomplete.  For example, Cisco's

---

[1] The defendants are Artesyn Technologies, Inc., Astec America, Inc., Bel Fuse Inc., Cherokee International Corp., Delta Electronics, Inc., Delta Products Corp., Lineage Power Corp., Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., Murata Power Solutions, Inc., and Power-One, Inc.

[2] The patents-in-suit are U.S. Patent No. 7,072,190, U.S. Patent No. 7,272,021, U.S. Patent No. 7,269,034, U.S. Patent No. 7,558,083, and U.S. Patent No. 7,564,702.

1

production of its sales of end products as well as which of defendants' bus converters are used in which end products is incomplete. Cisco has refused to produce other relevant information, such as worldwide sales information and any analyses it made on whether it had viable alternatives to IBA for the products in which it was used. Accordingly, SynQor respectfully requests that the Court grant its motion to compel and order Cisco to comply with the subpoena at issue.

## II.  STATEMENT OF FACTS

### A.  The Patented Technology and the Litigation

The patents-in-suit are directed to, among other things, certain power conversion systems known as unregulated and semi-regulated intermediate bus architectures ("IBA"). Dr. Martin Schlecht of SynQor, a former Professor of Electrical Engineering at MIT, invented and pioneered the novel IBA systems, which provide a more efficient way to convert direct current voltage from a higher level to multiple lower levels. The patented systems utilize one or more components called unregulated or semi-regulated "bus converters," with certain advantageous features, which isolate the output voltage from the input voltage. The outputs of these bus converters are connected to multiple non-isolated components now called "point of loads" (POLs or their discrete equivalents) which tightly regulate their output voltages. Following SynQor's development of these novel components for use in IBA systems, the defendants proceeded to introduce their own imitations. The defendants then sold (and continue to sell) these bus converters (and some of the POLs), which are covered by the claims and specifically designed to be used in the infringing systems, to end product manufacturers such as Cisco, who incorporate them in a directly infringing manner into boards for use in computer systems. To assist Cisco in locating relevant documents and information, SynQor identified each of the defendants' unregulated and semi-regulated bus converters sold to Cisco for use in IBA systems. (DeZern Decl., Ex. E).

### B.  The Subpoena to Cisco and Cisco's Response to Date

On June 9, 2009, SynQor served its subpoena on Cisco, attached hereto as Exhibit A to the DeZern Decl. The subpoena includes nineteen document requests in Schedule A and twenty-one deposition topics in Schedule B, which are set forth in full followed by Cisco's objections in Exhibit C to the DeZern Decl. The document requests can generally be divided into four categories:

### 1.    Requests Relating to Cisco's Use of Defendants' Products in IBA Systems.

#### a.    SynQor's Requests

Document request numbers 1, 2, 3, 4, and 8-12 are narrowly tailored to seek documents sufficient to show the identity and technical characteristics of Cisco's IBA systems and the defendants accused bus converters and POLs used in those systems.  In summary, these requests seek documents sufficient to identify each of Cisco's IBA products, including each specific board that uses IBA (Request #1), the basic technical characteristics of the power supply design of each such product (Request #2), where and by whom each product is made or sold by or for Cisco (Requests #3-4), and the suppliers, part numbers, quantities and allocations of unregulated and/or semi-regulated bus converters and or POLs for each product (Requests #8-12).  These documents are clearly relevant to the direct infringement of the patents-in-suit that is being induced by and contributed to by the defendants in the Texas action.

#### b.    Cisco's Response

Despite the fact that over a year has passed since SynQor's subpoena was served, Cisco has still not produced information sufficient to identify all of its IBA products, the technical characteristics of the power supply design of those products, and which of defendants' bus converters are qualified for use in each of those end products, and the allocations of qualified defendants' bus converters and POLs used in those products.

Although Cisco has produced some information, its productions have been incomplete and insufficient to show the information requested.  Cisco has yet to identify end products for each of the defendants' bus converters that SynQor identified to Cisco in Nov. 2009, and produce the requested information for each Cisco end product.  (DeZern Decl., Ex. E).  This results in at least two problems with Cisco's production to date:  (i) Cisco has yet to identify all of its IBA products; and (ii) the documents Cisco has produced to date lack important information for the IBA products that Cisco has identified.

3

### i.    Cisco's Failure to Identify All of Its IBA products

Based on the information available to SynQor, Cisco has not yet identified all of its IBA products. Cisco has produced sales data purportedly indicating the quantity of Cisco IBA products sold in the U.S. Based on the schematics that Cisco has linked with these end products, it is possible to determine the total number of bus converters accounted for by these end products.[3] However, the information produced by the defendants regarding their sales to Cisco (which SynQor has given to Cisco) indicates bus converter sales to Cisco that are approximately 5 times the number accounted for by Cisco's sales data.[4] This is plainly inconsistent with the fact that Cisco sells approximately half of its products into the U.S., according to its SEC filings. (DeZern Decl., Exs. R, S & T). It appears that this discrepancy may result, at least in part, from the fact that Cisco has not yet identified any IBA products as incorporating the bus converters sold to Cisco by several of the defendants, including Artesyn Technologies, Astec America, Bel Fuse, or Lineage Power, even though SynQor provided information on sales of those bus converters to Cisco many months ago. (*See* DeZern Decl., Exs. E & O).

### ii.    Deficiencies Regarding IBA products Cisco Has Identified

Cisco's production of documents for the IBA products that Cisco has identified is also incomplete. To date, Cisco has not produced documents showing all of the defendants' bus converters that are qualified for use in each of its end products using IBA. This information is reflected in documents known as "split awards" which identify the particular bus converters that are qualified for a particular end product as well as the allocations of each of those bus converters that are to be supplied from each supplier.

On May 28, after repeated requests from SynQor, Cisco produced some "split awards" showing Cisco part numbers and allocations for some of the defendants in the Texas action.

---

[3] Some technical arrangements for Cisco's IBA products indicate the use of more than one bus converter.

[4] The proportion of defendants' bus converter sales that are accounted for by Cisco's sales data was obtained by comparing information from Cisco's and defendants' sales data. Cisco and the defendants have designated their sales data confidential under a protective order entered in the Texas action, but SynQor would gladly share this information with the Court upon request.

4

The allocations reflected in these split awards account for some, but not all, of the bus converters qualified for use in the IBA products that Cisco has identified to date. Cisco has not provided any split awards for some of the Cisco part numbers associated with the IBA.

For some of the IBA products that Cisco has identified, Cisco has identified more than one schematic and bus converter part number associated with the IBA product. SynQor's understanding is that the schematic and bus converter(s) associated with these IBA products either changed during the life of the end product or there were different options available for that end product. SynQor has requested documents from Cisco to enable SynQor to differentiate between these different possibilities so that it will have documents sufficient to show the suppliers of the bus converters for each end product unit and its associated technical characteristics. (*See* DeZern Decl., Ex. P). Cisco has yet to produce any such documents.

Beyond the information contained in Cisco's split awards, Cisco has stated that it does not have information on precisely which of the various defendants' bus converters and POLs are used in each of its IBA products. Cisco has stated that it contracts out the manufacture of its board to contract manufacturers, and only these manufacturers know precisely which of the qualified bus converters and POLs are used in each particular board. SynQor has requested that Cisco obtain this information from its contract manufacturers, who produce these boards for Cisco pursuant to Cisco's specifications. Cisco, however, refused to do so. (*See* DeZern Decl., Ex. J, at 2; Ex. M, at 2).

### 2.    Requests for Worldwide Sales Data for Cisco IBA Products

Document request numbers 5, 6, and 7 seek documents that are relevant to show the number of infringing Cisco products manufactured and/or sold and documents sufficient to show the percentage made/used/sold/imported into the United States. Cisco initially produced sales data that SynQor believed represented worldwide sales. Later, Cisco stated that this information did not represent worldwide sales, and produced new information showing approximately half of its original figures, which it then stated was U.S. sales data. To date, Cisco has not responded to SynQor's request asking for clarification of what the initial and later sales data included. (*See* DeZern Decl., Ex. P, at 3).

5

In any event, SynQor has requested that Cisco produce its worldwide sales data for its IBA products. (*See* DeZern Decl., Ex. P, at 2-3). Worldwide sales data is relevant to the commercial success of the claimed invention, an important secondary consideration of nonobviousness. *See, e.g., 3Com Corp. v. D-Link Sys, Inc.*, 2007 WL 949596, at *4 (N.D. Cal. Mar. 27, 2007) (Walker, C.J.) ("worldwide sales and profits are relevant to the affirmative defense of obviousness" because "the greater the commercial success worldwide, the more likely the patent is not obvious"). Worldwide sales are also relevant to the posture of the parties during a hypothetical negotiation, which forms the basis for a reasonable royalty determination, including the value to the defendants of being able to supply their products for use in end products sold worldwide, including into the United States. *See, e.g., id.* at *4 ("worldwide profits and sales are relevant to a reasonable royalty calculation"). In addition, worldwide sales data would better enable SynQor to test the reliability of Cisco's U.S. numbers, because Cisco's worldwide sales should closely correspond to the bus converter sales reported by the defendants. Particularly given the questionable U.S. sales numbers that Cisco has reported thus far (missing some defendants products and representing a much lower percentage of U.S. sales than Cisco reports on a company wide basis), this is extremely important.

Cisco has refused to produce its worldwide sales information of infringing IBA systems, asserting that it would be unduly burdensome to do so. But Cisco has not explained why retrieving this information (which most likely resides in a database at Cisco) would impose an undue burden on Cisco.

### 3. Requests for Documents Showing Defendants Knowledge of the Use of Its Products by Cisco

Document request numbers 13-15 seek documents showing that the defendants are aware that their bus converters and/or POLs are incorporated in Cisco IBA products sold in the United States. This information is relevant to defendants' inducement of infringement of the patents–in–suit. To date, Cisco has not produced any documents responsive to these requests, nor has it indicated that it has performed a reasonable search for such documents.

6

### 4. Requests Relating to Cisco's Decision to Use IBA and Consideration of Alternatives

Document requests numbers 16-19 seek documents that discuss, among other things, the reasons Cisco adopted IBA in its systems as well as communications relating to SynQor's IBA systems and praise for IBA designs. SynQor sought this information because it is relevant to secondary considerations of nonobviousness, including long-felt need for the claimed inventions, adoption by others, and industry praise. *See In re Mettke*, 570 F.3d 1356, 1359 (Fed. Cir. 2009) (objective indicia of non-obviousness include "commercial success, long felt need, and failure of others"); *Power-One, Inc. v. Artesyn Technologies, Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (copying and industry praise are secondary considerations of nonobviousness). It is also relevant to SynQor's claim for lost profits damages, as related to whether acceptable non-infringing alternatives existed for the patented IBA systems. *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1329 (Fed. Cir. 2009) (lost profits theory requires a showing of "absence of acceptable noninfringing substitutes").

Cisco has stated that after a reasonable search, it was unable to locate any documents relating to its original decision to use IBA in Cisco products. But Cisco has refused to perform a reasonable search to determine whether any documents exist concerning any subsequent attempts by Cisco to analyze whether it had a viable alternative to IBA for the products in which IBA was or is used. Cisco has asserted that it would be unduly burdensome to search for such documents, but has not explained why performing a targeted, reasonable search would impose an undue burden.

## III. ARGUMENT

### A. Legal Standards

The starting point for the assessment of any discovery request – whether of a party or third party – is an analysis of whether the discovery sought is proper under Fed. R. Civ. P. 26. *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 821 & n.42 (5th Cir. 2004) (reversing district court's order quashing subpoena of third-party, and stating that a party to a federal "civil action is entitled to all information relevant to the subject matter of the action before the court unless such information is privileged," quoting Rule 26); *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80

7

(N.D. Cal. 2006) (scope of discovery through third party subpoena is governed by Rule 26). Under Rule 26, the issue is whether the discovery sought is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). "Relevance under Rule 26(b)(1) is construed more broadly for discovery than for trial." *Truswal Systems Corp. v. Hydro-Air Engineering, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) (vacating order to quash subpoena on a nonparty).

These standards apply to third parties who have been subpoenaed as well as parties to an action. Indeed, in the context of a third party subpoena, a district court that has no connection to the underlying case, "should be 'especially hesitant to pass judgment on what constitutes relevant evidence thereunder.'" *See Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 335 (N.D. Cal. 1995) (citation omitted). "Where the relevance is in doubt" as to the requested information, "the court should be permissive" in granting discovery. *Id.*

Discovery may be limited if it is "unreasonably cumulative or duplicative," if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive," if there was "ample opportunity to obtain the information by discovery in the action," or if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C). The party objecting to discovery, however, bears the burden of showing that the discovery is improper. *Sedaghatpour v. California*, 2007 WL 4259214, *1 (N.D. Cal. Dec. 3, 2007) (denying motion to quash subpoena of third party medical professionals). As discussed below, Cisco has not met and cannot meet this burden.

**B.      The Discovery Sought is Relevant, Not Unduly Burdensome, and Not Readily Obtainable From the Defendants or Third Parties**

For each of the categories of document requests enumerated above, discovery of the requested material is appropriate. The information requested is clearly relevant to the underlying action. Cisco has not made any showing that the requested information would be unduly burdensome to produce, is available from the defendants in the Texas action, or would be readily available from other sources.

8

### 1.   Requests Relating to Cisco's Use of Defendants' Products in IBA Systems.

The requests relating to Cisco's use of defendants' bus converters and POLs in Cisco's IBA systems (Request Nos. 1, 2, 3, 4, and 8-12) are directly relevant to multiple issues in the Texas action. This information is relevant to SynQor's infringement claims because it will show that the defendants' bus converters and POLs are used in Cisco's end products in a manner which directly infringes the claims of the patents-in-suit, which is a component of showing contributory and induced infringement by the defendants. *See Dynacore Holding Corp.*, 363 F.3d at 1272. Producing this information would not be unduly burdensome to Cisco. SynQor has narrowly tailored these requests to the information that is necessary to show direct infringement – the identity of each of Cisco's products that incorporate one of defendants' bus converters or POLs in an infringing matter. Cisco has the information on the sales of its products, the boards and specifications of those products, the specific bus converters qualified for use in those boards and specifications, and the information on "split awards" showing the allocation of those bus converters among the various suppliers. In fact, Cisco has produced at least partial information on these points as noted above. SynQor simply needs Cisco to produce complete information as requested for each of the bus converters that Cisco purchases from defendants. Furthermore, SynQor needs Cisco to produce this information promptly so that SynQor's rights are not prejudiced in the Texas action.

Cisco has not identified any other source from which SynQor can readily obtain this information. Moreover, SynQor has done everything possible to reduce the burden on Cisco. SynQor has given Cisco a list of each of the defendants' bus converters that it believes are used in an infringing manner by Cisco and asked for schematics of only Cisco products that incorporate those bus converters. (*See* DeZern Decl., Ex. E). It has even identified the Cisco end product information to the extent the defendants have provided it. (*Id.*). After Cisco produced enough information for SynQor to determine that the total number of end products is demonstrably low and incomplete, SynQor even obtained permission from the defendants to forward excerpts from defendants' confidential sales data to aid Cisco's investigation. (*See* DeZern Decl., Exs. P & Q).

The bottom line is that the information SynQor seeks is not in the possession of any party to the underlying suit, nor is it more readily available from any other third party. Cisco can certainly produce schematics of its own products and identify where and by whom those products are made and sold, and identify who supplies the bus converters and POLs for those products. Cisco designs its own boards and qualifies defendants' products for use in those boards. It also negotiates prices with its suppliers based on split awards. Cisco certainly keeps records of this information in the ordinary course of its business and merely needs to produce those records to SynQor.

Cisco should also be required to request the actual quantity of bus converters and POLs supplied by each defendant for each Cisco IBA board. Cisco has somewhat dubiously alleged that this information is not in its possession, but even if that is the case, the information is in Cisco's control because Cisco has the ability to obtain the information from its contract manufacturers. Cisco designs its own end products and qualifies the parts that are to be used in those products. The contract manufacturers are hired to manufacture the end products according to Cisco's specific instructions and specifications. It would not be unduly burdensome for Cisco to request information from its contract manufacturers regarding the parts that Cisco directs them to use. *See In re Legato Systems, Inc. Securities Litigation*, 204 F.R.D. 167, 170 (N.D. Cal. 2001) (control is found when there is a right to access documents "created by statute, affiliation or employment"); *Camden Iron and Metal, inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 443 (D.N.J. 1991) ("a company's ability to demand and have access to documents in the normal course of business gives rise to the presumption that such documents are in the litigating corporation's control").

### 2.    Requests for Worldwide Sales Data for Cisco IBA Products

The requests in category (2) seek information about the total quantity of Cisco's infringing products, and the quantity of bus converters or POLs that each defendant has supplied for use in those infringing products. As noted above, this information is relevant and important to show commercial success of the claimed invention, an important secondary consideration of nonobviousness, as well as for evidence relevant to a reasonable royalty analysis. *See, 3Com*, 2007 WL 949596 at *4. SynQor also needs this information to test and verify the reliability of the U.S. numbers being provided by Cisco. Cisco argues that the burden of producing this information

10

outweighs the value of this information to SynQor. To the contrary, this information is extremely important to SynQor's case. And, SynQor cannot understand how providing worldwide sales data imposes any significant burden after Cisco has purportedly provided U.S. sales data. SynQor understands that the sales information is retained in Cisco sales databases. Cisco has already managed to filter this data to produce U.S. only sales data. SynQor simply asks that Cisco perform the same process, but instead of filtering out only U.S. data, provide SynQor the total numbers for the Cisco products that it has identified. Such a request cannot possibly impose a burden that outweighs SynQor's need for evidence of nonobviousness, evidence that may increase the reasonable royalty that SynQor could seek, and evidence needed to cross-link the defendants' sales information to Cisco sales information.

**3.    Requests for Documents Showing Defendants Knowledge of the Use of Its Products by Cisco**

The requests in category (3) seek documents that show the defendants know their products are being used by Cisco in an infringing manner. This information is clearly relevant to show the state of mind of the defendants, which is relevant to defendants' induced infringement of the patents-in-suit. *See DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (plaintiff must show that infringer "knew or should have known his actions would induce actual infringements") (quoting *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)). Cisco has provided no reason why it would be unduly burdensome to perform a reasonable search for such documents.

**4.    Requests Relating to Cisco's Decision to Use IBA and Consideration of Alternatives**

The requests in category (4) seek documents that consist of communications discussing Cisco's decision to use IBA power supply design and its consideration of alternative to IBA for the systems in which it was used. This information is relevant to SynQor's claim for lost profits, as it supports SynQor's claim that it could have made the sales of its products to Cisco but for the infringement, and undercuts defendants' claim that there were noninfringing alternatives. It is also relevant to secondary considerations of nonobviousness, including long-felt need for the claimed

11

inventions, adoption by others, and industry praise. *See In re Mettke*, 570 F.3d at 1359; *Power-One*, 599 F.3d at 1352.

Cisco says it conducted a reasonable search for documents relating to Cisco's "original efforts to incorporate intermediate bus architecture components into Cisco products." (*See* DeZern Decl., Ex. I, at 3-4). Even if so, that does not suffice. Cisco continues to sell IBA products. It therefore should have responsive documents in its possession from more recent times, including the present – and, if not, it should so indicate. To date, however, Cisco has refused to even make a reasonable search for such documents. Even after SynQor offered to limit the request to documents specifically analyzing whether Cisco had a viable alternative to IBA for the specific boards where it was or is being used, Cisco still refused to conduct a search. Cisco has provided no reason why it would be unduly burdensome for Cisco to perform a reasonable search for such documents. These documents have also been requested from defendants, but Cisco may have internal documents in its possession that defendants do not. For this reason, Cisco should be compelled to conduct a reasonable search for responsive documents. And, if it has no such documents, it should so indicate.

## III.    CONCLUSION

For the reasons stated above, SynQor respectfully requests that this Court grant its motion and compel Cisco to comply with the subpoena at issue.

Dated:  June 22, 2010

Respectfully submitted,

SIDLEY AUSTIN LLP

By: _____
Aaron R. Bleharski
Attorney For Movant
SynQor, Inc.

12

Aaron R. Bleharski (SBN 240703)
ableharski@sidley.com
SIDLEY AUSTIN LLP
1801 Page Mill Road, Suite 110
Palo Alto, California 94304
Telephone: (650) 565-7000
Facsimile: (650) 565-7100

Attorney for Movant
SynQor, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE SUBPOENA  ISSUED TO CISCO SYSTEMS, INC. | Case No.: |
| | [E.D. Tex. Case No. 2:07-CV-497-TJW-CE, *SynQor, Inc. v. Artesyn Tech., Inc. et al.*] |
| | **CERTIFICATE OF SERVICE** |

**CERTIFICATE OF SERVICE**

I am employed in the County of San Mateo, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Sidley Austin LLP, 1801 Page Mill Road, Suite 220, Palo Alto, California 94304.

On June 22, 2010, I served the foregoing documents described as:

(1)  **SynQor's Notice Of Motion and Motion to Compel Compliance With Its Subpoena to Cisco Systems, Inc. (Pursuant to F.R.C.P. 45);**

(2)  **Declaration Of David T. DeZern in Support of SynQor, Inc.'s Motion to Compel, and accompanying exhibits;**

(3)  **Proposed Order Granting SynQor, Inc.'s Motion To Compel.**

⊠    (FEDERAL EXPRESS) I served the foregoing document(s) by Federal Express as follows: I placed true copies of the document(s) in a sealed envelope addressed to each interested party as shown above. I placed each such envelope for collection and mailing at Sidley Austin LLP, Palo Alto, California. I am readily familiar with the Firm's practice for collection and processing of correspondence for mailing via Federal Express (an express service carrier which provides overnight delivery). Under that practice, the sealed, addressed envelope(s) are delivered to an authorized courier or driver authorized by Federal Express the same date they are collected and processed, with all charges paid.

Served on counsel for Cisco, Inc. in connection with SynQor's June 4, 2009 subpoena, as listed below:

Mr. Kurt M. Pankratz
Baker Botts LLP
2001 Ross Avenue
Dallas, Texas 75201-2980
United States of America

Executed on June 22, 2010 in Palo Alto, California 94304. I declare under penalty of perjury that the foregoing is true and correct.

_____
Aaron R. Bleharski

**CERTIFICATE OF SERVICE**
2