BAKER BOTTS L.L.P.
Kurt Pankratz (TX #24013291) (admitted *pro hac vice)*
2001 Ross Avenue
Dallas, TX 75201-2980
Telephone: (214) 953-6500
Facsimile : (214) 953-6503
Email: kurt.pankratz@@bakerbotts.com

Kevin E. Cadwell (CA#255794)
620 Hansen Way
Palo Alto, CA 94304
Telephone: (650) 739-6500
Facsimile: (650) 739-6599
Email: kevin.cadwell@bakerbotts.com

Attorneys for CISCO SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE SUBPOENA ISSUED TO CISCO SYSTEMS, INC. | Case No. 5:10-MC-80144-JW-HRL |
| | **CISCO SYSTEM, INC.'S OPPOSITION TO SYNQOR, INC.'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA** |
| | Date:   August 3, 2010<br>Time:   10:00 A.M.<br>Judge: Hon. Howard R. Lloyd<br>Place:  Courtroom 2, 5th Floor |

## **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................................ii

I.      INTRODUCTION. ...............................................................................................................1

II.     BACKGROUND. ..................................................................................................................2

      A.      Cisco's Relationship to the Litigation Parties.........................................................2

      B.      SynQor's Subpoena..................................................................................................2

      C.      Cisco's Production Efforts. ......................................................................................4

            1.      Product and Sales Information (Document Requests 1 to 7). ......................4

            2.      Use of Defendans' Components (Document Requests 8 to 12)....................5

            3.      Consideration of Design Alternatives (Document Requests 13 to 19). ............................................................................................................6

III.    ARGUMENT. ........................................................................................................................6

      A.      Cisco Has Produced All Relevant Information Regarding Its Products (Document Requests 1 to 12)...................................................................................6

      B.      SynQor Seeks to Compel Discovery Beyond the Permissible Scope......................7

            1.      Information Regarding the Actual Use of Defendants' Components is Not Within Cisco's Control (Document Request 9). ..............................9

            2.      Cisco's Burden of Re-Generating Worldwide Sales Data Based on SynQor's Revised Requests Greatly Exceeds any Limited Probative Value (Document Requests 4, 6, and 7)........................................................10

            3.      Discovery Directed to the Party Defendants' State of Mind is Properly Directed to the Party Defendants (Document Requests 13 to 15). ..........................................................................................................11

            4.      SynQor's Requests for Present Day Documents are Beyond the Scope of the Original Subpoena (Document Requests 18 to 19)...............12

IV.     CONCLUSION......................................................................................................................13

CISCO'S OPPOSITION TO SYNQOR'S MTC                                    Case No. 5:10-MC-80144-JW-HRL

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bio-Vita, Ltd. v. Biopure Corp.*,
  138 F.R.D. 13 (D. Mass. 1991)........................................................................................ 8

*Chaveriat v. Williams Pipe Line Co.*,
  11 F.3d 1420 (7th Cir. 1993)......................................................................................... 10

*Cohen v. City of New York*,
  255 F.R.D. 110 (S.D.N.Y. 2008) .................................................................................. 11

*Dart Indus. Co. v. Westwood Chem. Co.*,
  649 F.2d 646 (9th Cir. 1980)..................................................................................... 8, 12

*Del Campo v. Kennedy*,
  236 F.R.D. 454 (N.D. Cal. 2006).............................................................................. 7, 8

*Diamond State Ins. Co. v. Rebel Oil Co., Inc.*,
  157 F.R.D. 691 (D. Nev. 1994)..................................................................................... 12

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  2008 WL 5273634 (N.D. Cal. 2008)............................................................................ 10

*Gonzales v. Google, Inc.*,
  234 F.R.D. 674 (N.D. Cal 2006) ............................................................................... 7, 10

*Hansen Beverage Co. v. Innovation Ventures, LLC*,
  2009 WL 2351769 (E.D. Mich 2009) ........................................................................... 12

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999)......................................................................................... 9

*Laxalt v. McClatchy*,
  116 F.R.D. 455 (D. Nev. 1986)....................................................................................... 8

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
  420 F.3d 1369 (Fed. Cir. 2005)..................................................................................... 11

*Moon v. SCP Pool Corp.*,
  232 F.R.D. 633 (C.D. Cal. 2005) .............................................................................. 12, 13

*United States v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO*,
  870 F.2d 1450 (9th Cir. 1989)........................................................................................ 9

## TABLE OF AUTHORITIES
### Continued

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(b)(2) ................................................................................................ 8, 11, 12

Fed. R. Civ. P. 30(b)(6) ................................................................................................................ 2

Fed. R. Civ. P. 34(a)(1) ................................................................................................................ 9

Fed. R. Civ. P. 45 ................................................................................................................... 7, 8

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

## I.      **INTRODUCTION**.

SynQor does not complain that Cisco has failed to search for and produce documents responsive to SynQor's subpoena.  It cannot, because Cisco has cooperated with SynQor to collect and produce responsive documents, including highly confidential product design schematics and reports generated at considerable effort—documents beyond that which Cisco, as a nonparty, should even be required to produce.  Instead, SynQor complains that it does not have everything it wants, without regard to: (i) whether Cisco possesses such documents; (ii) whether its requests are more appropriately directed to party defendants; (iii) the relevance of the information it seeks; (iv) the burden it seeks to impose on a nonparty; and (v) whether its subpoena even encompasses the information it now seeks to compel Cisco to produce.  SynQor's attempt to compel additional production without regard to these considerations is inappropriate and should be denied.

As the correspondence attached as exhibits to SynQor's motion evidences, Cisco worked with SynQor to focus SynQor's overbroad requests and identify properly responsive materials.  Cisco also repeatedly attempted to obtain documents and information from SynQor to help streamline Cisco's discovery efforts, but received no meaningful assistance for almost a year.  Notwithstanding SynQor's confounding lack of assistance, Cisco has collected and either has or will shortly have produced all documents reasonable to request.  Cisco has even gone beyond its duty to respond by generating reports to provide information sought by SynQor.

With respect to the requested deposition, there is no dispute.  In the very first conversation with SynQor, Cisco expressed a willingness to present a corporate witness as needed.  SynQor's motion is the first request for a deposition since that conversation over one year ago.  Cisco and SynQor have now set dates for a Cisco corporate deposition.

Four categories of documents remain in dispute.  These include (1) documents not within Cisco's possession custody, or control; (2) reports that Cisco would have to re-generate to include information that SynQor originally asked to exclude (and that is of dubious relevance); (3) information that the party defendants necessarily have; and (4) documents outside the scope of SynQor's subpoena, that the burden of producing would far outweigh its potential relevance, and

1

CISCO'S OPPOSITION TO SYNQOR'S MTC                              Case No. 5:10-MC-80144-JW-HRL

that the party defendants should have.  As to (1), Cisco cannot produce what it does not have.  As to (2), after leading Cisco down one path for over a year, SynQor cannot justify asking Cisco to re-execute a highly burdensome endeavor—well beyond that which is appropriate to ask of a non party—for information of at best marginal relevance.  As to (3) and (4), SynQor cannot justify or explain why it either cannot or will not obtain discovery from the direct source of information— party defendants.  Cisco respectfully submits that SynQor's motion should be denied.

## II.   BACKGROUND.

### A.   Cisco's Relationship to the Litigation Parties.

Cisco is a complex global organization with a vast array of suppliers, manufacturers and distributors.  SynQor was one of those suppliers.  SynQor sued a number of Cisco's other suppliers alleging that they infringe SynQor's patents by supplying components, commonly referred to as "bus converters," that are used in certain types of power architectures (ways of distributing power to components on a device).[1]  These suppliers do not supply products directly to Cisco.  Rather, the suppliers provide these components to third party device manufacturers, who then build a variety of boards that incorporate these components.  Cisco sells these boards, typically incorporated into one of a number of larger products.

In the past, SynQor was a supplier of bus converters for Cisco products and, because of that history, SynQor is familiar with the different parties and their relationships, knows Cisco personnel, and even has Cisco documents relating to these processes.

### B.   SynQor's Subpoena.

On June 9, 2009, SynQor served Cisco with the subpoena at issue.  The subpoena includes nineteen document requests and a request for a Rule 30(b)(6) deposition setting out twenty-one deposition topics.  The document requests are broad, vague, and in many instances facially improper.  For example, the requests include topics seeking documents or information necessarily held by the defendants, such as information regarding the defendants' knowledge of certain matters (requests 13-15) and facially overbroad topics seeking "all documents and/or

---

[1] Power architectures that incorporate bus converters that distribute power to multiple points of load are commonly referred to as "intermediate bus architecture" or "IBA" systems.

2

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

communications" regarding various expansive issues (requests 16-19).  SynQor Motion Ex. A. Cisco promptly contacted SynQor to formally object but also to make clear that it was willing to cooperate to help focus the requests and respond.  SynQor Motion Ex. C at 1.

Notably, SynQor's brief fails to clearly set forth SynQor's document requests or Cisco's responsive production efforts.  Cisco now presents these facts.

**Document Requests 1 and 2 relate to identification and technical characteristics of Cisco IBA products.**  SynQor requests documents sufficient to identify each Cisco IBA product, and to show "the basic technical characteristics of the power supply design of the IBA product . . . ."

**Document Requests 3 and 5 relate to manufacture of Cisco IBA products.** SynQor requests documents sufficient to show where and by whom each IBA product is made for or by Cisco and the quantities of IBA products made from July 4, 2006 to the present.

**Document Requests 4, 6, and 7 relate to sales of Cisco IBA products.**  SynQor requests documents sufficient to show where and by whom each IBA product is sold for or by Cisco, the quantities of IBA products sold from July 4, 2006 to present, and the percentage made, used, sold, offered for sale and/or imported into the United States.

**Document Requests 8–12 relate to suppliers of components for IBA products.** SynQor requests documents sufficient to show the suppliers of unregulated and/or semi-regulated bus converters and/or POLs, and projected and actual allocations of Cisco and Cisco manufacturers' purchases of these components from Cisco suppliers since July 4, 2006.

**Document Requests 13–15 relate to suppliers' (Defendants') knowledge.** SynQor requests documents sufficient to show suppliers know their unregulated and/or semi-regulated bus converters and/or POLs are used in Cisco IBA products made and/or sold in the United States.

**Document Requests 16–19 relate to vague, unfocused requests.**  SynQor requests "all" documents and/or communications regarding SynQor's unregulated and/or semi-regulated bus converters, praise for any unregulated and/or semi-regulated IBA power supply design, Cisco's introduction to an unregulated and/or semi-regulated IBA power supply design,

3

and the reasons and motivations behind Cisco's adoption of an unregulated and/or semi-regulated IBA power supply design.

### C.    Cisco's Production Efforts.

### 1.    Product and Sales Information (Document Requests 1–7).

Based on discussions with SynQor's counsel, Cisco focused its initial efforts on identifying and providing technical details regarding Cisco products at issue.  Because of Cisco's size and the distribution of engineering efforts across business units, Cisco repeatedly sought help from SynQor in identifying what products were at issue.  As we now know, SynQor should have been able to obtain this information, which would have significantly accelerated the process, from the party defendants.  SynQor Motion Ex. Q at 1 (attaching charts that list Cisco part numbers at issue from a defendant).  However, rather than provide meaningful help in this process, SynQor repeatedly assured Cisco that it was difficult for it to obtain helpful leads.  Notwithstanding this lack of assistance, Cisco investigated what products might be at issue, and in October 2009, Cisco produced highly confidential design schematics for what we now know are the bulk of products targeted by SynQor.  SynQor Motion Ex. D.

In November 2009, SynQor followed up with a purported list of products at issue.  SynQor Motion Ex. E.  While SynQor now asserts in its motion that this list "identified each of the defendants' unregulated and semi-regulated bus converters sold to Cisco," that is not true in any meaningful sense.  SynQor Motion at 2.  The list from SynQor contains fourteen pages of unusable information, including references to vague classes of products (e.g., "Server – Enterprise" and "Test Equipment") and long lists of what appear to be internal identifiers used by the defendants.  SynQor redacted the entire list in its attached exhibit, and because this document contains almost exclusively the defendants' proprietary information, Cisco is also uncomfortable sharing it in un-redacted form.  However, the simple fact that SynQor's subsequent correspondence attempts to identify Cisco part numbers at issue evidences that SynQor's November 2009 letter did not, as SynQor now contends, identify all the products at issue.

After Cisco's initial production, Cisco continued to cooperate and, based on the ongoing dialogue with SynQor, began collecting U.S. sales information for the identified Cisco

4

products.  Because of the distributed nature of Cisco's operations and the non-standard nature of SynQor's requests, collecting this sales information has proven to be a complicated and time-consuming effort.  Regardless, Cisco compiled this information into spreadsheets and generated charts linking the design schematics to the compiled sales information.

On June 9 and June 16, 2010, shortly before filing its motion to compel, SynQor provided Cisco with information obtained from the party defendants that identified additional Cisco part numbers at issue.  SynQor Motion Ex. Q.  Based on this new information and additional investigations aided by that information, Cisco is working to supplement its production and will produce all remaining materials in advance of the scheduled Rule 30(b)(6) deposition.

## 2.    Use of Defendans' Components (Document Requests 8–12).

SynQor seeks information regarding the precise quantities of defendants components used in Cisco products.  As discussed above, Cisco does not itself purchase these components.  Rather, third party device manufacturers purchase these components from various suppliers and then incorporate them into products that Cisco ultimately sells.  SynQor, as a former Cisco supplier, is well aware of this.  Moreover, Cisco has repeatedly made SynQor aware that Cisco does not have information regarding the actual usage of defendants' components and that SynQor should seek this information from the third party device manufacturers.  *See, e.g.*, SynQor Motion Ex. I at 2-3.

SynQor verbally assured Cisco that it had targeted discovery on those device manufacturers, but after repeated requests for SynQor to confirm that fact in writing, SynQor finally admitted that it had not.  *See* SynQor Motion Ex. I at 3; Ex. M at 2.  Despite the fact that Cisco did not have the relevant information and that SynQor was not even attempting to obtain it from the source, SynQor continued to press Cisco for information on this topic.  While Cisco does not have information regarding actual usage of the defendants' components, Cisco does create "split awards," which are charts that suggest percentage allocations among different suppliers.  While this information is of doubtful accuracy or relevance with respect to actual numbers, Cisco agreed to produce it.

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

In discussions with SynQor regarding how best Cisco could track down and produce this split award information, SynQor informed Cisco that it had Cisco documents of the exact type sought that identified information that would aid Cisco's discovery efforts.  Despite the fact that these were *Cisco documents* that would help Cisco speed up the discovery process, SynQor repeatedly refused to provide copies.  SynQor Motion Ex. I at 3; Ex. J at 2.  Nevertheless, Cisco was able through its own efforts to identify, collect and produce copies of the requested documents.  Based on its investigation, Cisco is not aware of any other documents in its possession, custody, or control that are relevant to this inquiry.

### 3.    Consideration of Design Alternatives (Document Requests 13–19).

With respect to SynQor's broad, vague, and wide ranging document requests 13-19, Cisco negotiated with SynQor regarding a targeted search.  SynQor Motion Ex. H at 2; Ex. I at 3-4.  Based on guidance from SynQor, Cisco performed a focused investigation to determine whether specifically-identified Cisco personnel possessed documents regarding Cisco's original efforts to incorporate IBA components into Cisco products.  SynQor Motion Ex. I at 4.  Cisco was unable to identify any responsive documents, and reported this to SynQor.  *Id.*

## III.    ARGUMENT.

### A.    Cisco Has Produced All Relevant Information Regarding Its Products (Document Requests 1–12).

In response to document requests 1–12, which relate to technical characteristics of Cisco products, identification of manufacturer's of Cisco products, sales of Cisco products, and allocation of supplier components in Cisco products, Cisco's production to date includes: technical schematics regarding the products at issue; U.S. sales data for those products; information sufficient to link the schematics with the sales data; and documents showing Cisco's "split awards" (suggested allocation of supplier components in products at issue).  And as discussed above, despite the general rule that "nonparties are not required to create documents that do not exist, simply for the purposes of discovery," Cisco has invested considerable effort in doing just that.  *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 683 (N.D. Cal 2006).  Specifically,

6

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

Cisco extracted and compiled sales information from across a number of different Cisco business units into spreadsheets, and then compiled reports to link technical schematics to sales data.

Just last month, as mentioned above, SynQor shared information with Cisco, obtained from the party defendants, that identifies additional Cisco part numbers at issue. SynQor Motion Ex. Q at 1. This shows not only that SynQor's November 2009 letter did not, as SynQor now contends, "identif[y] each of the defendants' unregulated and semi-regulated bus converters sold to Cisco," but also shows that if SynQor had merely sought the part number information from the defendants sooner, it would have dramatically decreased the amount of effort required by Cisco to identify parts and the time required for Cisco to identify and produce responsive materials. Regardless, with respect to documents reasonably sought by SynQor, and even with respect to compilations of information beyond what would normally be required for a third party, there is no dispute. Cisco has collected and produced those documents and is supplementing to account for recently identified products. Cisco will complete its production of this information prior to the scheduled Cisco corporate deposition.

### B.    SynQor Seeks to Compel Discovery Beyond the Permissible Scope.

Though not mentioned in SynQor's motion to compel, discovery from a nonparty is governed by Rule 45 of the Federal Rules of Civil Procedure. *Del Campo v. Kennedy*, 236 F.R.D. 454, 457 (N.D. Cal. 2006). Rule 45(c)(3) mandates that the Court "shall" quash or modify a subpoena if the subpoena "subjects a person to undue burden." In addition, the Court may limit discovery of even relevant documents if "(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;" if "(ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought;" or if "(iii) the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2). With regard to nonparty discovery under Rule 45, the Court "balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Del Campo,* 236 F.R.D. at 458. The Ninth Circuit recognizes the unique burden that liberal discovery may place on a nonparty and observed that such discovery should be more limited to protect

7

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

nonparties from harassment, inconvenience, or disclosure of confidential documents. *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980). As a result, it is not enough to establish that the information sought is relevant to justify nonparty discovery. *See*, *e.g.*, *Id.*; *Bio-Vita, Ltd. v. Biopure Corp.*, 138 F.R.D. 13, 17 (D. Mass. 1991); *see also Laxalt v. McClatchy*, 116 F.R.D. 455, 458 (D. Nev. 1986) ("The standards for nonparty discovery . . . require a stronger showing of relevance than for simple party discovery."). In spite of the numerous protections afforded to nonparties in discovery, and Cisco's record of cooperation, SynQor now seeks to compel production beyond the bounds of fair discovery, yet SynQor fails to make any showing to justify such requests.

As best Cisco can gather from discussions with SynQor and SynQor's motion, there are four categories of disputed documents, each of which would impose an impermissible burden on Cisco. First, SynQor seeks to compel Cisco to obtain and produce documents of third party device manufacturers even though any such documents, if they exist, would be outside Cisco's possession, custody, or control. Second, SynQor asks for Cisco to completely re-create spreadsheets showing sales information to include worldwide sales data, despite the facts that (a) SynQor expressly pressed Cisco to produce U.S. only information and then only recently changed its request, and (b) the burden on nonparty Cisco far outweighs the potential relevance. Third, SynQor asks for documents related to the party defendants' knowledge even though this request seeks information that the parties to the litigation necessarily have. Fourth, SynQor seeks documents regarding Cisco's present day considerations of design alternatives, a request that is unduly burdensome, outside the scope of SynQor's subpoena, and seeks documents more appropriately obtained from the party defendants.

While SynQor's motion addresses these four categories of documents with some specificity, it is worth noting that SynQor's proposed order goes far beyond these requests. In its proposed order, SynQor seeks documents in accordance with the full scope of its original, overbroad document requests. The potential hardship to the Cisco in responding to SynQor's document requests, whether in the original or narrowed form, outweighs both the relevance of the discovery sought and SynQor's need to obtain such discovery from nonparty Cisco.

8

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

### 1.    Information Regarding the Actual Use of Defendants' Components is Not Within Cisco's Control (Document Request 9).

SynQor demands that Cisco provide documents to show the actual number of components from each party defendant that are used in Cisco's IBA products.  As discussed above, Cisco does not have this information.  It resides with third party device manufacturers.  Cisco has produced documents showing split awards, which are Cisco's suggested allocations of defendants' components.  But SynQor, likely not satisfied with the split awards because they do not show *actual* numbers used, seeks to compel Cisco to perform discovery on third parties that SynQor has chosen itself not to pursue.  That is improper, as those third party device manufacturer documents, to the extent they even exist, are not within Cisco's possession, custody, or control.  Fed. R. Civ. P. 34(a)(1).

As the party seeking production of documents, SynQor bears the burden of proving that Cisco has control.  *United States v. Int'l Union of Petroleum and Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989).  Proof of theoretical control is insufficient; a showing of <u>actual</u> control is required.  *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999).  Instead of seeking discovery from the appropriate party, SynQor erroneously presumes that Cisco has a "legal right" to demand information from the device manufacturers, and SynQor hopes to pass off its discovery burden to Cisco.

As noted by Judge Posner, "the fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean that the document is in its possession, custody or control; <u>in fact it means the opposite</u>." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993) (emphasis added).  Cisco only has a business relationship with the device manufacturers, which are not representatives, agents, or employees of Cisco. *Garner v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 5273634, at *1 (N.D. Cal. 2008).  Thus, Cisco has no legal right to obtain the documents sought.  Therefore, SynQor cannot meet its burden to demonstrate Cisco's control of any third party device manufacturer documents, and SynQor's improper request for an order shifting the cost and burden of third party discovery from SynQor to nonparty Cisco should be denied.

9

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

**2.    Cisco's Burden of Re-Generating Worldwide Sales Data Based on SynQor's Revised Requests Greatly Exceeds any Limited Probative Value (Document Requests 4, 6, and 7).**

Cisco repeatedly informed SynQor that it would compile sales data to show U.S. sales information for identified products. Not only did SynQor acknowledge this, SynQor specifically focused Cisco's efforts on collecting U.S. sales information, stating: "As you appreciate, our focus is on determining the Cisco IBA products that were made/used/sold/imported into the U.S." SynQor Motion Ex. H at 1. After SynQor permitted Cisco to go to considerable effort compiling spreadsheets tailored to SynQor's needs, SynQor recently revised its requests and now seeks worldwide sales data. This request should be denied, as it would place a significant burden on Cisco to compile new reports showing information of marginal relevance, at best.

Notwithstanding the general rule that "nonparties are not required to create documents that do not exist, simply for the purposes of discovery," Cisco collected and compiled information into spreadsheets that show relevant U.S. sales information. *Gonzales,*, 234 F.R.D. at 683. During this process, Cisco informed SynQor of the burdensome nature of its requests, given that they required Cisco to provide information not kept in the normal course of business. This effort was disruptive and required Cisco to allocate resources and personnel spread across multiple different business units to extract information from a variety of sources, which was then compiled to create reports identifying U.S. sales of specific products. To generate worldwide sales reports would require Cisco to repeat these efforts.

The information sought here is of very low probative value. Because products made and sold outside the United States are beyond the reach of the territorial limits of U.S. patent law, any damages calculation will be based on the number of units sold in the United States. *See*, *e.g., MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005). Moreover, SynQor has not established why the data for U.S. sales is not sufficient with regard to the reasonable royalty calculation or establishing secondary indicia of non-obviousness. In fact, SynQor acknowledges that it was able to approximate the scope of Cisco's U.S. sales based on publicly available information. SynQor Motion at 4 (citing to Cisco's

10

publicly available corporate disclosures).  SynQor fails to explain why a similar approximation for worldwide sales cannot be made and why that is not sufficient.  Nor has SynQor demonstrated that the information it now seeks from Cisco would be anything more than cumulative of other evidence of a reasonable royalty calculation or secondary indicia of non-obviousness.

In short, the high burden that would be imposed on Cisco to re-build reports based on SynQor's changing requests far outweighs any probative value for worldwide sales data.  The Court should deny this discovery, because the "burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(iii).  Further, as is the case here, the Court "should be particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] nonparty."  *Cohen v. City of New York*, 255 F.R.D. 110, 117 (S.D.N.Y. 2008) (citations omitted).  It is SynQor's burden to show that it needs the discovery in question from a nonparty.  SynQor has failed to meet that burden and establish that the probative value of the worldwide data justifies the burden that would be placed on Cisco.

**3.** **Discovery Directed to the Party Defendants' State of Mind is Properly Directed to the Party Defendants (Document Requests 13–15).**

SynQor also demands that Cisco provide documents and information necessarily within the party defendants' control.  Specifically, SynQor seeks documents to show what the defendants—not Cisco—know about different topics.  SynQor Motion Ex. A at Doc. Requests 13-15.  SynQor has no right to burden nonparty Cisco with duplicative and cumulative discovery that is readily available from a party to the litigation.  *Diamond State Ins. Co. v. Rebel Oil Co., Inc.*, 157 F.R.D. 691, 697 (D. Nev. 1994); *see also* Fed. R. Civ. P. 26 (b)(2).  When the information is readily available from the parties to the litigation, requiring nonparty Cisco to investigate for that information constitutes an undue burden.  *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005); *Hansen Beverage Co. v. Innovation Ventures, LLC*, 2009 WL 2351769, at *2 (E.D. Mich 2009).

SynQor does not even attempt to show why it needs this discovery from nonparty Cisco, nor why it either has not or cannot obtain such discovery from party defendants directly.  Rather, SynQor argues only that the information is relevant and that Cisco has provided no reason

11

why the discovery is unduly burdensome. But even if the information were relevant, SynQor bears the burden of persuasion here and must show why discovery must be compelled from nonparty Cisco when the information it seeks so obviously is under the party defendants' control. Civil L.R. 37-2; *Dart Indus.*, 649 F.2d at 649.

### 4. SynQor's Requests for Present Day Documents are Beyond the Scope of the Original Subpoena (Document Requests 18–19).

SynQor's subpoena requests "[a]ll documents and/or communications" (a) regarding Cisco's "introduction to" and (b) behind Cisco's "adoption of" IBA power supply designs. SynQor Motion Ex. A at Doc. Requests 18 and 19. While these requests as written are vague and overbroad, as discussed above in Section C.3, Cisco worked with SynQor to focus on an appropriate search for responsive documents. Based on guidance from SynQor, Cisco investigated whether specifically-identified Cisco personnel had documents regarding Cisco's original efforts to incorporate IBA components into Cisco products, but did not identify any responsive documents. SynQor Motion Ex. I at 4. Now in its motion, SynQor argues that this was not sufficient and that Cisco should produce documents regarding IBA components "from more recent times, including the present." SynQor Motion at 12. The Court should deny this request for at least three reasons: (1) it is outside the scope of the original subpoena; (2) the burden of such a search outweighs the likely probative value of any such documents; and (3) party defendants are the best source for such information.

SynQor makes no effort to show that present day documents regarding viable alternatives fall within the scope of the original subpoena. The relevant requests relate to the "*introduction to*" and "*adoption of*" IBA power supply designs. SynQor Motion Ex. A at Doc. Requests 18 and 19. SynQor's new demand for documents relating to the continuing and present day consideration or use of alternative power architectures is thus beyond the scope of the original subpoena.

Surprisingly, SynQor asserts that Cisco has provided no reason why it would be unduly burdensome to produce present day documents related to potential alternative power architectures. SynQor Motion at 12. That is not true. Cisco informed SynQor that its overly

12

CISCO'S OPPOSITION TO SYNQOR'S MTC                    Case No. 5:10-MC-80144-JW-HRL

broad discovery requests would encompass every power architecture for which Cisco has information, thereby potentially calling for production of hundreds of thousands of documents at considerable time and expense to Cisco. SynQor Motion Ex. M at 3. Further, contrary to its representation that it has offered to narrow discovery, SynQor's proposed order does not limit the scope of its document requests, which go well beyond the scope of information that SynQor describes in its motion. Nevertheless, even though Cisco can demonstrate that SynQor's requests are unduly burdensome, it is ultimately SynQor's burden to demonstrate why discovery from a nonparty like Cisco is appropriate. Civil L.R. 37-2. It has not and cannot.

Moreover, SynQor's demands for information regarding potential design alternatives are more appropriately targeted at the party defendants, as they are the designers of the bus converters at issue. Requiring a nonparty such a Cisco to investigate for information readily available from the parties constitutes an undue burden. *See, e.g.*, *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005). While SynQor alleges that Cisco may have documents that the party defendants do not, as with its other unreasonable demands, SynQor has made no efforts to identify documents already produced by the party defendants or make a showing that such documents are not sufficient. Consequently, SynQor has failed to meet its burden to demonstrate that the probative value of discovery regarding IBA alternatives outweighs the burden to nonparty Cisco.

## IV.    CONCLUSION.

For the foregoing reasons, Cisco respectfully requests that the Court deny SynQor's Motion to Compel.

DATED: July 13, 2010                              Respectfully submitted,

                                                  BAKER BOTTS L.L.P.


                                                  By:    */s/ Kurt Pankratz*
                                                              Kurt Pankratz
                                                  Attorneys for CISCO SYSTEMS, INC.

13

CISCO'S OPPOSITION TO SYNQOR'S MTC                          Case No. 5:10-MC-80144-JW-HRL